Chief Justice Roberts,
with whom
Justice Scalia and Justice Thomas join, concurring in the judgment in part and dissenting in part.
To overcome the procedural hurdle that Paul House created by failing to properly present his constitutional claims to a Tennessee court, he must demonstrate that the constitutional violations he alleges “ha[ve] probably resulted in the *556 conviction of one who is actually innocent,” such that a federal court’s refusal to hear the defaulted claims would be a “miscarriage of justice.” Schlup v. Delo, 513 U. S. 298, 326, 327 (1995) (internal quotation marks omitted). To make the requisite showing of actual innocence, House must produce “new reliable evidence” and “must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence.” Id., at 324, 327 (emphasis added). The question is not whether House was prejudiced at his trial because the jurors were not aware of the new evidence, but whether all the evidence, considered together, proves that House was actually innocent, so that no reasonable juror would vote to convict him. Considering all the evidence, and giving due regard to the District Court’s findings on whether House’s new evidence was reliable, I do not find it probable that no reasonable juror would vote to convict him, and accordingly I dissent.
Because I do not think that House has satisfied the actual innocence standard set forth in Schlup, I do not believe that he has met the higher threshold for a freestanding innocence claim, assuming such a claim exists. See Herrera v. Collins, 506 U. S. 390, 417 (1993). I therefore concur in the judgment with respect to the Court’s disposition of that separate claim.
I
In Schlup, we stated that a habeas petitioner attempting to present a defaulted claim to a federal court must present “new reliable evidence — whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence — that was not presented at trial.” 513 U. S., at 324 (emphasis added). Implicit in the requirement that a habeas petitioner present reliable evidence is the expectation that a factfinder will assess reliability. The new evidence at issue in Schlup had not been subjected to such an assessment — the claim in Schlup was for an evidentiary hearing— *557 and this Court specifically recognized that the “new statements may, of course, be unreliable.” Id., at 331. The Court stated that the District Court, as the “reviewing tribunal,” was tasked with assessing the “probative force” of the petitioner’s new evidence of innocence, and “may have to make some credibility assessments.” Id., at 327-328, 330. Indeed, the Supreme Court took the unusual step of remanding the case to the Court of Appeals “with instructions to remand to the District Court,” so that the District Court could consider how the “likely credibility of the affiants” bears upon the “probable reliability” of the new evidence. Id., at 332. In short, the new evidence is not simply taken at face value; its reliability has to be tested.
Critical to the Court’s conclusion here that House has sufficiently demonstrated his innocence are three pieces of new evidence presented to the District Court: DNA evidence showing that the semen on Carolyn Muncey’s clothing was from her husband, Hubert Muncey, not from House; testimony from new witnesses implicating Mr. Muncey in the murder; and evidence indicating that Mrs. Muncey’s blood spilled from test tubes containing autopsy samples in an evidence container. To determine whether it should open its door to House’s defaulted constitutional claims, the District Court considered this evidence in a comprehensive evidentiary hearing. As House presented his new evidence, and as the State rebutted it, the District Court observed the witnesses’ demeanor, examined physical evidence, and made findings about whether House’s new evidence was in fact reliable. This factfinding role is familiar to a district court. “The trial judge’s major role is the determination of fact, and with experience in fulfilling that role comes expertise.” Anderson v. Bessemer City, 470 U. S. 564, 574 (1985).
The State did not contest House’s new DNA evidence excluding him as the source of the semen on Mrs. Muncey’s clothing, but it strongly contested the new testimony impli *558 eating Mr. Muncey, and it insisted that the blood spillage occurred after the FBI tested House’s jeans and determined that they were stained with Mrs. Muncey’s blood.
At the evidentiary hearing, sisters Kathy Parker and Penny Letner testified that 14 years earlier, either during or around the time of House’s trial, they heard Mr. Muncey drunkenly confess to having accidentally killed his wife when he struck her in their home during an argument, causing her to fall and hit her head. Record, Doc. 274, pp. 28-29, 30, 37-38. Schlup provided guidance on how a district court should assess this type of new evidence: The court “may consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence,” and it “must assess the probative force of the newly presented evidence in connection with the evidence of guilt adduced at trial.” 513 U. S., at 332. Consistent with this guidance, the District Court concluded that the sisters’ testimony was not credible. The court noted that it was “not impressed with the allegations of individuals who wait over ten years to come forward.” App. 348. It also considered how the new testimony fit within the larger web of evidence, observing that Mr. Muncey’s alleged confession contradicted the testimony of the Munceys’ “very credible” daughter, Lora Tharp, who consistently testified that she did not hear a fight in the house that night, but instead heard a man with a deep voice who lured her mother from the house by saying that Mr. Muncey had been in a wreck near the creek. Id., at 323, 348.
The District Court engaged in a similar reliability inquiry with regard to House’s new evidence of blood spillage. At the evidentiary hearing, House conceded that FBI testing showed that his jeans were stained with Mrs. Muncey’s blood, but he set out to prove that the blood spilled from test tubes containing autopsy samples, and that it did so before the jeans were tested by the FBI. The District Court summarized the testimony of the various witnesses who handled *559 the evidence and their recollections about bloodstains and spillage; it acknowledged that House’s expert, Dr. Cleland Blake, disagreed with FBI Agent Paul Bigbee about how to interpret the results of Agent Bigbee’s genetic marker analysis summary; and it summarized the testimony of the State’s blood spatter expert, Paulette Sutton. Id., at 339-347. After reviewing all the evidence, the District Court stated: “Based upon the evidence introduced during the evidentiary hearing . . . the court concludes that the spillage occurred after the FBI crime laboratory received and tested the evidence.” Id., at 348 (emphasis added).
Normally, an appellate court reviews a district court’s factual findings only for clear error. See Fed. Rule Civ. Proc. 52(a) (“Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses”); Bessemer City, supra, at 574 (clearly-erroneous standard applies “even when the district court’s findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts”). The Sixth Circuit deferred to the District Court’s factual' findings, 386 F. 3d 668, 684 (2004), and Schlup did not purport to alter — but instead reaffirmed and highlighted — the district court’s critical role as factfinder. Yet the majority asserts that the clear error standard “overstates the effect of the District Court’s ruling,” arid then dismisses the District Court’s reliability findings because it is “uncertain about” them, while stopping short of identifying clear error. Ante, at 539-540. This is a sharp departure from the guidance in Schlup.
In Schlup, we contrasted a district court’s role in assessing the reliability of new evidence of innocence with a district court’s role in deciding a summary judgment motion. 513 U. S., at 332. We explained that, in the latter situation, the district court does not assess credibility or weigh the evi *560 dence, but simply determines whether there is a genuine factual issue for trial. Ibid. Assessing the reliability of new evidence, on the other hand, is a typical factfinding role, requiring credibility determinations and a weighing of the “probative force” of the new evidence in light of “the evidence of guilt adduced at trial.” Ibid. We found it “[o]bviou[s]” that a habeas court conducting an actual innocence inquiry must do more than simply check whether there are genuine factual issues for trial. Ibid. The point of the actual innocence inquiry is for the federal habeas court to satisfy itself that it should suspend the normal procedural default rule, disregard the important judicial interests of finality and comity, and allow a state prisoner to present his defaulted constitutional claims to a federal court. See McCleskey v. Zant, 499 U. S. 467, 490-491 (1991).
The majority surprisingly states that this guidance is inapplicable here because this case involves a “fully developed record,” while the District Court in Schlup had declined to conduct an evidentiary hearing. Ante, at 537-538. But the guidance is clearly applicable: The point in Schlup was not simply that a hearing was required, but why — because the District Court had to assess the probative force of the petitioner’s newly presented evidence, by engaging in factfinding rather than performing a summary-judgment-type inquiry. 513 U. S., at 331-332. That is precisely what the District Court did here. In addition to a “fully developed record,” we have the District Court’s factual findings about the reliability of the new evidence in that record, factual findings which the majority disregards without finding clear error.
The majority essentially disregards the District Court’s role in assessing the reliability of House’s new evidence. With regard to the sisters’ testimony, the majority casts aside the District Court’s determination that their statements carné too late and were too inconsistent with credible record evidence to be reliable, instead observing that the women had no obvious reason to lie, that a few aspects of *561 their testimony have record support, and that they recounted an uncoerced confession. Ante, at 551-552. As for the District Court’s express finding that the autopsy blood spilled after the FBI tested House’s jeans, the majority points to Dr. Blake’s testimony that blood enzymes “are generally better preserved on cloth,” and even conjures up its own theory in an attempt to refute Ms. Sutton’s expert testimony that the pattern of some bloodstains was consistent with blood being transferred while the pants were being worn. Ante, at 546-547 (“This should be a matter for the trier of fact to consider in the first instance, but we can note a line of argument that could refute the State’s position. . . . [Ms. Sutton’s] testimony . . . does not refute the hypothesis that the packaging of the pants for transport was what caused them to be folded or creased”); see App. 296.
The majority’s assessment of House’s new evidence is precisely the summary-judgment-type inquiry Schlup said was inappropriate. 513 U. S., at 332. By casting aside the District Court’s factual determinations made after a comprehensive evidentiary hearing, the majority has done little more than reiterate the factual disputes presented below. Witnesses do not testify in our courtroom, and it is not our role to make credibility findings and construct theories of the possible ways in which Mrs. Muncey’s blood could have been spattered and wiped on House’s jeans. The District Court did not painstakingly conduct an evidentiary hearing to compile a record for us to sort through transcript by transcript and photograph by photograph, assessing for ourselves the reliability of what we see. Schlup made abundantly clear that reliability determinations were essential, but were for the district court to make. Id., at 331-332. We are to defer to the better situated District Court on reliability, unless we determine that its findings are clearly erroneous. We are not concerned with “the district court’s independent judgment as to whether reasonable doubt exists,” id., at 329, but the District Court here made basic factual findings about *562 the reliability of House’s new evidence; it did not offer its personal opinion about whether it doubted House’s guilt. Schlup makes clear that those findings are controlling unless clearly erroneous.
I have found no clear error in the District Court’s reliability findings. Not having observed Ms. Parker and Ms. Letner testify, I would defer to the District Court’s determination that they are not credible, and the evidence in the record undermining the tale of an accidental killing during a fight in the Muncey home convinces me that this credibility finding is not clearly erroneous. Dr. Alex Carabia, who performed the autopsy, testified to injuries far more severe than a bump on the head: Mrs. Muncey had bruises on the front and back of her neck, on both thighs, on her lower right leg and left knee, and her hands were bloodstained up to the wrists; her injuries were consistent with a struggle and traumatic strangulation. Record, Addendum 4, 7 Tr. of Evidence in No. 378 (Crim. Ct. Union County, Tenn.), pp. 984-987 (hereinafter Tr.). And, of course, Lora Tharp has consistently recalled a deep-voiced visitor arriving late at night to tell Mrs. Muncey that her husband was in a wreck near the creek. App. 19, 270.
I also find abundant evidence in the record to support the District Court’s finding that blood spilled within the evidence container after the FBI received and tested House’s jeans. Agent Bigbee testified that there was no leakage in the items submitted to him for testing. Id., at 277. The majority’s entire analysis on this point assumes the agent flatly lied, though there was no attack on his credibility below. Moreover, Ms. Sutton determined, in her expert opinion, that the wide distribution of stains “front and back, top to bottom,” the fact that some bloodstains were mixed with mud, and the presence of bloodstains inside the pocket and inside the fly, showed that the blood was spattered and wiped — not spilled — on House’s jeans. Id., at 291-293, 295; id., at 293 (“[I]f a tube of blood had spilled on these pants, *563 the stain should have been in a localized area”); id., at 294 (“The stains also ... either originate on the inside and don’t soak out or on the outside and are not soaking to the inside. That, of course, would be what you would see with a spill”).
It is also worth noting that the blood evidently spilled inside the evidence container when the jeans were protected inside a plastic zip lock bag, as shown by the presence of a bloodstain on the outside of that bag. See Record, PL Exh. 10-6. House’s expert tested the exterior and interior of that plastic bag for bloodstains using an “extremely sensitive” test, and only the exterior of the bag tested positive for blood. Id., Doc. 274, at 95-96. The evidence in the record indicates that the jeans were placed in the plastic bag after they arrived at the FBI: FBI records show that the jeans arrived there in a paper bag, and the plastic bag has FBI markings on it. Id., Addendum 2, Trial Exh. 31, at 36; id., Pl. Exh. 10-6. The bloodstain on the outside of the plastic bag therefore further supports the District Court’s conclusion that the blood spilled after the evidence was received and tested by the FBI, and not en route when the jeans were in a paper bag. I suppose it is theoretically possible that the jeans were contaminated by spillage before arriving at the FBI, that Agent Bigbee either failed to note or lied about such spillage, and that the FBI then transferred the jeans into a plastic bag and put them back inside the evidence container with the spilled blood still sloshing around sufficiently to contaminate the outside of the plastic bag as extensively as it did. This sort of unbridled speculation can theoretically defeat any inconvenient fact, but does not suffice to convince me that the District Court’s factual finding — that the blood spilled after FBI testing — was clearly erroneous.
Moreover, the yellow “Tennessee Crime Lab” tape placed around the container on all four sides does not line up when the bloodstained corners of the container and its lid are aligned, showing that the blood did not spill until sometime after the container was received and opened at its first desti *564 nation — the FBI. See id., Respondent’s Exh. 24; id., Doc. 276, at 190-191 (testimony of Paulette Sutton). The majority points out that on one side of the container, the first of two layers of tape appears to begin cleanly at the lid’s edge, and from this concludes that the container must have been cut open and resealed by Tennessee authorities en route to the FBI. Ante, at 545; see Record, Respondent’s Exh. 23d. Even if the majority’s deduction from a photograph of the container were true, it would show only that Tennessee authorities had reason to open the container once it was sealed to take something out or put something in, perhaps back at the crime lab in Union County. But even if the container had been opened before its arrival at the FBI, the majority recognizes that it was resealed with “Tennessee Crime Lab” tape, and the second layer of tape aligns only when the bloodstains on the container and its lid do not. Ante, at 544. Of course, the District Court — which concluded that the blood was spilled after testing at the FBI laboratory — had before it the box itself with the tape as the witnesses testified on the point, and not — like this Court — simply a photograph. See Bessemer City, 470 U. S., at 574 (district court’s findings about physical evidence are reviewed for clear error).
House’s theory that the blood on his jeans was transferred there from the autopsy samples is based on Dr. Blake’s reading of Agent Bigbee’s enzyme marker analysis summary. After reading the summary, Dr. Blake concluded that the enzymes in the bloodstains on House’s jeans and the enzymes in the autopsy samples had deteriorated to the same extent. Record, Doc. 275, at 110. In particular, he noted that the GLOl enzyme showed “incomplete penetration” on both the autopsy blood and the jeans, and because enzymes are better preserved on cloth, the enzyme should have been present on the jeans. Id., at 116. But Agent Bigbee disputed Dr. Blake’s reading of what was, after all, Agent Bigbee’s own study. He testified that “ fine’ ” on his chart meant “incon *565 elusive,” not “incomplete penetration,” and that the term “inconclusive” meant that the enzyme was present, but could not be grouped into an ABO bloodtype. Id., Doc. 276, at 140. While pointing out that his summary showed different levels of enzymes in the two samples, Agent Bigbee also noted that many different factors — such as heat, dirt, or'bacteria in a clothes hamper — could cause enzymes to degrade on cloth. Id., at 139, 167-170. Considering how House’s new blood spillage evidence fits within the record as a whole, I can see no clear error in the District Court’s express finding that the blood spilled in the evidence container after the FBI found Mrs. Muncey’s blood on House’s jeans.
The District Court attentively presided over a complex evidentiary hearing, often questioning witnesses extensively during the presentation of critical evidence. See, e. g., id., Doc. 275, at 110-115. The court concisely summarized the evidence presented, then dutifully made findings about the reliability of the testimony it heard and the evidence it observed. We are poorly equipped to second-guess the District Court’s reliability findings and should defer to them, consistent with the guidance we provided in Schlup.
II
With due regard to the District Court’s reliability findings, this case invites a straightforward application of the legal standard adopted in Schlup. A petitioner does not pass through the Schlup gateway if it is “more likely than not that there is any juror who, acting reasonably, would have found the petitioner guilty beyond a reasonable doubt.” 513 U. S., at 333 (O’Connor, J., concurring) (emphasis added).
The majority states that if House had presented just one of his three key pieces of evidence — or even two of the three — he would not pass through the Schlup gateway. See ante, at 548 ('Were House’s challenge to the State’s case limited to the questions he has raised about the blood and semen, the other evidence favoring the prosecution might *566 well suffice to bar relief”); ante, at 552-553 (“If considered in isolation, a reasonable jury might well disregard [the evidence pointing to Mr. Muncey]. In combination, however, with the challenges to the blood evidence and the lack of motive with respect to House, the evidence pointing to Mr. Muncey likely would reinforce other doubts as to House’s guilt”). According to the majority, House has picked the trifecta of evidence that places conviction outside the realm of choices any juror, acting reasonably, would make. Because the case against House remains substantially unaltered from the case presented to the jury, I disagree.
At trial, the State presented its story about what happened on the night of Mrs. Muncey’s murder. The Munceys’ daughter heard a deep-voiced perpetrator arrive at the Muncey home late at night and tell Mrs. Muncey that her husband had been in a wreck near the creek. App. 19. Ms. Tharp relayed her testimony again at the evidentiary hearing, and the District Court determined that she was a “very credible witness.” Id., at 270, 323.
When police questioned House after witnesses reported seeing him emerge from the embankment near Mrs. Muncey’s body shortly before it was discovered, he told two different officers that he never left Donna Turner’s trailer the previous evening, even recounting the series of television programs he watched before going to bed. 7 Tr. 963-965, 1031-1032. He had worked to concoct an alibi we now know was a lie. On the day Mrs. Muncey’s body was found, Bill Breeding, a criminal investigator at the Union County Sheriff’s Office, observed House at the local jail and noticed that he had abrasions “across his knuckles and about his hands,” two or three bruises on his right arm, scratches on his chest, and his right ring finger was red and swollen. 6 id., at 801-802. The interviewing officers noticed similar injuries. App. 78-80; 7 Tr. 974-975. House told them that his finger was swollen because he fell off a porch, and the scratches and bruises were from tearing down a building, and from a *567 cat. Ibid. Ms. Turner initially confirmed House’s alibi, but she changed her story when police warned her that covering up a homicide was a serious offense. Id., at 1063. Ms. Turner then told police that House had in fact left her house that night between 10:30 and 10:45 p.m. Id., at 1062-1063. He came back some time later panting and sweating, shirtless and shoeless, and with various injuries. App. 88-91; 8 Tr. 1154-1155.
Also on the day the body was found, Sheriff Earl Loy asked House if he was wearing the same clothes he wore the night before. 6 id., at 845. House “hesitated,” then stated that he had changed his shirt, but not his jeans. Ibid. In other words, he specifically tried to conceal from the police that he had worn other jeans the night before, for reasons that were to become clear. Ms. Turner revealed that House’s statement that he had not changed his jeans was a lie, and police retrieved House’s dirty jeans from Ms. Turner’s hamper. Ibid. Of course, FBI testing revealed that House’s jeans were stained with Mrs. Muncey’s blood, and the District Court determined that House’s new evidence of blood spillage did not undermine those test results. App. 348. If in fact Mrs. Muncey’s blood only got on House’s jeans from later evidentiary spillage, House would have had no reason to lie to try to keep the existence of the concealed jeans from the police.
Through Ms. Turner’s testimony at trial, the jury also heard House’s story about what happened that night. He left Ms. Turner’s trailer late at night to go for a walk. Id., at 86. When he returned some time later — panting, sweating, and missing his shirt and shoes — he told her that some men in a truck tried to kill him. Id., at 88-91. When Ms. Turner asked House about his injuries, he attributed them to fighting with his assailants. Id., at 90; 8 Tr. 1154-1155. House retold this story to the District Court, saying that he initially lied to police because he was on parole and did not want to draw attention to himself. Record, Doc. 276, at 99, *568 108-109. In other words, having nothing to hide and facing a murder charge, House lied — and when he was caught in the lie, he said he lied not to escape the murder charge, but solely to avoid unexplained difficulties with his parole officer. The jury rejected House’s story about the night’s events, and the District Court “considered Mr. House’s demeanor and found that he was not a credible witness.” App. 329.
The jury also heard House’s attempt to implicate Mr. Muncey in his wife’s murder by calling Mrs. Muncey’s brother, Ricky Green, as a witness. Mr. Green testified that two weeks before the murder, his sister called him to say that she and Mr. Muncey had been fighting, that she wanted to leave him, and that she was scared. 7 Tr. 1088. Mr. Green also testified that the Munceys had marital problems, and that he had previously seen Mr. Muncey hit his wife. Id., at 1087. The jury rejected House’s attempt to implicate Mr. Muncey, and the District Court was not persuaded by House’s attempt to supplement this evidence at the evidentiary hearing, finding that his new witnesses were not credible. App. 348.
Noticeably absent from the State’s story about what happened to Mrs. Muncey on the night of her death was much mention of the semen found on Mrs. Muncey’s clothing. House’s single victory at the evidentiary hearing was new DNA evidence proving that the semen was deposited by Mr. Muncey. The majority identifies the semen evidence as “[cjentral to the State’s case” against House, ante, at 528, but House’s jury would probably be quite surprised by this characterization. At trial, Agent Bigbee testified that from the semen stains on Mrs. Muncey’s clothing, he could determine that the man who deposited the semen had type A blood, and was a secretor. App. 54-56. Agent Bigbee also testified that House and Mr. Muncey both have type A blood, that House is a secretor, and that “[tjhere is an eighty (80%) percent chance that [Mr. Muncey] is a secretor.” Id., at 55-56; 6 Tr. 952 (emphasis added). Moreover, Agent Bigbee *569 informed the jury that because 40 percent of people have type A blood, and 80 percent of those people are secretors, the semen on Mrs. Muncey’s clothing could have been deposited by roughly one out of every three males. Id., at 957. The jury was also informed several times by the defense that Mrs. Muncey’s body was found fully clothed. See, e. g., 4 id., at 628; 9 id., at 1274.
The majority describes House’s sexual motive as “a central theme in the State’s narrative linking House to the crime,” and states that without the semen evidence, “a jury . . . would have found it necessary to establish some different motive, or, if the same motive, an intent far more speculative.” Ante, at 541. The State, however, consistently directed the jury’s attention away from motive, and sexual motive was far from a “central theme” of the State’s case— presumably because of the highly ambiguous nature of the semen evidence recounted above. The Tennessee Supreme Court did not mention that evidence in cataloging the “[particularly incriminating” or “[djamaging” evidence against House. App. 135. The State did not mention the semen evidence in its opening statement to the jury, instead focusing on premeditation. 4 Tr. 613-615. The defense used its opening statement to expose lack of motive as a weakness in the State’s case. Id., at 628. After the State’s equivocal presentation of the semen evidence through Agent Bigbee’s testimony at trial, the State again made no reference to the semen evidence or to a motive in its closing argument, prompting the defense to again highlight this omission. 9 id., at 1274 (“[W]hy was Carolyn Muncey killed? We don’t know. Is it important to have some motive? In your minds? What motive did Paul Gregory House have to go over and kill a woman that he barely knew? Who was still dressed, still clad in her clothes”).
In rebuttal, the State disclaimed any responsibility to prove motive, again shifting the jury’s focus to premeditation:
*570 “The law says that if you take another person’s life, you beat them, you strangle them, and then you don’t succeed, and then you kill them by giving them multiple blows to the head, and one massive blow to the head, and that that causes their brains to crash against the other side of their skull, and caused such severe bleeding inside the skull itself, that you die — that it does not make any difference under God’s heaven, what the motive was. That is what the law is. The law is that if motive is shown, it can be considered by the jury as evidence of guilt. But the law is that if you prove that a killing was done, beyond a reasonable doubt, by a person, and that he premeditated it, he planned it, it is not necessary for the jury to conclude why he did it.” App. 106.
As a followup to this explanation, when the trial was almost over and only in response to the defense’s consistent prodding, the State made its first and only reference to a possible motive, followed immediately by another disclaimer:
“Now, you may have an idea why he did it. The evidence at the scene which seemed to suggest that he was subjecting this lady to some kind of indignity, why would you get a lady out of her house, late at night, in her night clothes, under the trick that her husband has had a wreck down by the creek? . . . Why is it that you choke her? Why is it that you repeatedly beat her? Why is it that she has scrapes all over her body? Well, it is because either you don’t want her to tell what indignities you have subjected her to, or she is unwilling and fights against you, against being subjected to those indignities. . . . That is what the evidence at the scene suggests about motive. But motive is not an element of the crime. It is something that you can consider, or ignore. Whatever you prefer. The issue is not motive. The issue is premeditation.” Id., at 106-107.
*571 It is on this “obliqu[e]” reference to the semen evidence during the State’s closing argument that the majority bases its assertion that House’s sexual motive was a “central theme in the State’s narrative.” Ante, at 531, 541. Although it is possible that one or even some jurors might have entertained doubt about House’s guilt absent the clearest evidence of motive, I do not find it more likely than not that every juror would have done so, and that is the legal standard under Schlwp. The majority aphoristically states that “[w]hen identity is in question, motive is key.” Ante, at 540. Not at all. Sometimes, when identity is in question, alibi is key. Here, House came up with one — and it fell apart, later admitted to be fabricated when his girlfriend would not lie to protect him. Scratches from a cat, indeed. Surely a reasonable juror would give the fact that an alibi had been made up and discredited significant weight. People facing a murder charge, who are innocent, do not make up a story out of concern that the truth might somehow disturb their parole officer. And people do not lie to the police about which jeans they were wearing the night of a murder, if they have no reason to believe the jeans would be stained with the blood shed by the victim in her last desperate struggle to live.
In Schlup, we made clear that the standard we adopted requires a “stronger showing than that needed to establish prejudice.” 513 U. S., at 327. In other words, House must show more than just a “reasonable probability that . . . the factfinder would have had a reasonable doubt respecting guilt.” Strickland v. Washington, 466 U. S. 668, 695 (1984). House must present such compelling evidence of innocence that it becomes more likely than not that no single juror, acting reasonably, would vote to convict him. Schlup, supra, at 329. The majority’s conclusion is that given the sisters’ testimony (if believed), and Dr. Blake’s rebutted testimony about how to interpret Agent Bigbee’s enzyme marker analysis summary (if accepted), combined with the revelation that the semen on Mrs. Muncey’s clothing was de *572 posited by her husband (which the jurors knew was just as likely as the semen having been deposited by House), no reasonable juror would vote to convict House. Ante, at 553-554. Given the District Court’s reliability findings about the first two pieces of evidence, the evidence before us now is not substantially different from that considered by House’s jury. I therefore find it more likely than not that in light of this new evidence, at least one juror, acting reasonably, would vote to convict House. The evidence as a whole certainly does not establish that House is actually innocent of the crime of murdering Carolyn Muncey, and accordingly I dissent.